2024 IL App (2d) 230611
Nos. 2-23-0611 & 2-23-0612 cons.
Opinion filed July 26, 2024

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| BRIAN GRAHAM, | ) | Appeal from the Circuit Court |
| | ) | of Lake County. |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | No. 21-OP-2175 |
| | ) | |
| CAROL VAN RENGEN, | ) | Honorable |
| | ) | George T. Pappas, |
| Respondent-Appellant. | ) | Judge, Presiding. |

| | | |
|---|---|---|
| ANDREA L. GRAHAM, | ) | Appeal from the Circuit Court |
| | ) | of Lake County. |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | No. 21-OP-2176 |
| | ) | |
| CAROL ANN VAN RENGEN, | ) | Honorable |
| | ) | George T. Pappas, |
| Respondent-Appellant. | ) | Judge, Presiding. |

JUSTICE MULLEN delivered the judgment of the court, with opinion.
Presiding Justice McLaren and Justice Jorgensen concurred in the judgment and opinion.

**OPINION**

¶ 1 On November 29, 2021, the circuit court of Lake County entered separate, two-year plenary orders of protection in favor of petitioners, Brian Graham (Brian) and Andrea L. Graham (Andrea), and against respondent, Carol A. Van Rengen. Among other things, the plenary orders of protection enjoined respondent from (1) communicating with Brian, Andrea, and their children

(collectively, the Grahams) directly or indirectly through third parties or social media, and (2) coming within 500 feet of the Grahams, the Graham residence, the children's school, and other designated addresses. Prior to the expiration of the plenary orders of protection, Brian and Andrea moved to extend the orders. Following a hearing, the trial court granted petitioners' motions and entered orders extending the plenary orders of protection for an additional two years, until November 28, 2025. Respondent now appeals, arguing that the trial court erred in extending the plenary orders of protection, because petitioners failed to demonstrate "good cause" for the extensions. Respondent also argues that the trial court's judgment must be reversed and the orders extending the plenary orders of protection vacated because neither the report of proceedings nor the trial court's written orders contain the statutory findings required by section 214(c)(1) of the Illinois Domestic Violence Act of 1986 (Act) (750 ILCS 60/214(c)(1) (West 2020)). We affirm.

¶ 2                                    I. BACKGROUND

¶ 3     Brian and Andrea are married and have four children. Respondent is Andrea's mother and the grandmother of Brian and Andrea's children. Respondent is married to Jules Van Rengen (Jules), Andrea's father.

¶ 4                    A. Emergency and Initial Plenary Orders of Protection

¶ 5     On November 8, 2021, Brian and Andrea each petitioned for separate emergency orders of protection against respondent. In his petition, Brian alleged that respondent was "mentally unstable" and that, for the prior seven years, he had "gone to every measure to eliminate all contact" between respondent and his family. As a result, two of his children "dont [*sic*] even know who [respondent] is." Brian claimed that respondent continued to phone members of his family even though they had blocked her calls and that she had attempted to attend various functions at his children's school, prompting the school to turn respondent away and take measures to prevent

contact between her and the children. Brian further alleged that, the day before he filed the petition, respondent drove past his home while his children were playing outside. Brian claimed that respondent did this several times each week. Brian also claimed that respondent had recently attended a religious service at the children's school, sitting behind them and "staring at them trying to intimidate and harass them." Brian worried about the "emotional and physical distress" respondent's attempts at contact were causing the family. The police refused to intervene because nothing physical had happened. Andrea's petition contained almost identical allegations, adding that respondent continued to send the family e-mails "periodically especially *** around holidays and birthdays," often with content that "ma[de] no sense [and was] manic at times."

¶ 6 At an *ex parte* hearing held on the day the emergency petitions were filed, Brian told the trial court that he cut off contact with respondent because she is "mentally unstable" and "randomly show[s] up at places she wasn't invited to *** causing scenes, trying to create *** big, loud conflict in front of people." Before getting married, Brian and Andrea attended counseling with respondent, but the therapist said that respondent had a personality disorder and recommended they cut off contact with her. Brian said respondent and Jules will "sporadically appear" at a church service the family is attending. Brian recounted that respondent attended an open house at the children's school and was speaking to his daughter's fifth grade teacher when Brian walked in and confronted her, resulting in "a screaming match" and a "complete blowup." Respondent has also called various friends and family members, "making *** stuff up and trying to cause drama."

¶ 7 Andrea testified that her daughter was distressed at the open house because respondent was causing a scene and that her kids no longer wish to go outside because respondent might drive by. Andrea said that respondent attends mass every Tuesday at the church attached to the children's school and that she has seen respondent drive by the school when the children were on recess.

Brian said that respondent refused to stay away from the church, objecting that the church was a public place so there was nothing he could do about it. Brian said, "she's trying to antagonize me to the point where I'm going to do something, and I don't want to put my family in jeopardy."

¶ 8    The trial court granted petitioners' requests for emergency orders of protection, restricting respondent from having any direct or indirect contact with the Grahams. The court further ordered respondent to remain at least 500 feet away from the Graham home, the children's school, and Brian's parents' home. The matter was set for hearing on November 29, 2021, on the issuance of plenary orders of protection.

¶ 9    At the November 29, 2021, hearing, petitioners were represented by an attorney. Respondent proceeded *pro se*. Andrea testified that she lives in Libertyville and had been estranged from respondent for about six years. Earlier joint counseling efforts proved unproductive, so Andrea cut off all communication with respondent. Afterwards, respondent attempted to call Andrea, prompting Andrea to block her number. However, each time she did so, respondent would acquire a new phone number and call again. Respondent has also attempted to contact Andrea through e-mail, mail, Brian, and Brian's mother. Although respondent does not reside in Libertyville, she appears weekly at St. Joseph's Catholic School in the village, where the children are enrolled and Andrea volunteers. Andrea told the school administrators of her strained relationship with respondent, leading them to arrange an escort for the children through a special entrance. Respondent regularly attends open houses at the school and caused a scene at one. Respondent also tried to attend a school Christmas show but was turned away because the event was for immediate family only. Andrea testified that respondent drives by the family's house daily, which causes anxiety and discourages the children from going outside. Earlier in the year, respondent and Jules went to a homecoming football game at Carmel High School, Brian and

Andrea's *alma mater*. When Brian and Andrea arrived at the game with their children, respondent and Jules were sitting in the alumni tent. Respondent made eye contact but did not speak to the Grahams.

¶ 10    During her cross-examination of Andrea, respondent noted that, when Andrea lived in Chicago after the birth of Andrea and Brian's eldest child, she and Andrea were "very close." The court redirected respondent to ask questions, not tell her side of the story. Respondent asked Andrea why she cut off contact after moving to the suburbs and why she regarded respondent's behavior as "stalking." Andrea answered that respondent drove by her home daily, which impacted her and her children mentally and emotionally and caused her children to live in fear of an unexpected encounter with respondent. Respondent asserted that she had not communicated with the children directly and mentioned her previous close relationship with Andrea's eldest child, for whom she used to babysit. The court again cautioned respondent to ask questions. Respondent stated that she had a lot of questions. But when respondent stated that the St. Joseph's complex comprises an entire block in downtown Libertyville and included the church she attends, the court ended the cross-examination.

¶ 11    Brian testified that he agreed with Andrea's testimony about the events and their impact on his family. Brian further testified that, in 2015, respondent showed up at a church in Chicago for his brother's wedding service, even though she was not invited to the wedding. Brian did not know whether respondent spoke to anyone at the service, but she sat behind his parents, and he surmised that she had tried to obtain information about his family from other attendees, as was her custom. Respondent has also tried to call several of Brian's relatives over the years to obtain information, but they "shut it down as fast as possible." Although Brian's mother had blocked respondent from calling her years ago, respondent left her hundreds of voicemail messages "rambling on about

different things." Recently, respondent went to her other daughter's home in Wauconda uninvited, and someone called the police. Although Brian was not present for that incident, he heard that respondent caused a "big fight and spectacle," which led him to hire a lawyer to seek an order of protection. Brian said that, due to respondent's efforts to contact his family over the last six years, he worried about his children because he was "not sure what [respondent is] capable of."

¶ 12     On cross-examination, Brian admitted that he left a note on respondent's car while she was attending an event in downtown Libertyville. The note read as follows: "Carol, you are stalking our family. This is making things worse. We will be back with law enforcement. Leave our family alone. You're so sick, it's unreal. Jules, you should be ashamed." Brian also agreed that he sent respondent "very derogatory" e-mails, in which he called her "nuts" and a "psychopath" and encouraged Jules to divorce her. Respondent had never emailed him directly, so Brian did not block her e-mails. But Brian agreed that, after respondent attended an open house at her grandchildren's school at which he was not present, respondent sent Andrea an e-mail on February 1, 2020. The e-mail read as follows:

> "Hi. Wonderful open house. Ms. Hach taking time to show us [M.G.'s] cleaning chores. We saw the family snowman with all the buttons. Flat Stanley went to the firehouse with [S.G.] and Uncle Eric. Hoping we could go some day.
>
> Fourth grade [O.G.] wowed us with a Lady Liberty statue expressing our freedom. Must have been a great book. How proud we are of our grandchildren."

Brian responded from Andrea's e-mail account with the following:

> "Carol, you are a complete psycho. I wish Jules would pull his head out of the sand. We have told you countless times to stay away from our family, and you keep this up. Everyone in this school and parish knows you're a psychopath. Jules, you're pathetic that

you can't stand up to this monster who's abandoned your children. Carol, you are pathetic and are embarrassing yourself. The entire school knows you're nuts. They have a police officer in church now to keep an eye on you. Take this as another warning to stay away from our family. We will keep our attorney updated on your stalking."

Brian acknowledged that he tried to get respondent arrested in 2018 when she dropped off a present at Andrea's nephew's (respondent's grandson's) first birthday party, to which she had not been invited. When respondent started to describe that event, the court stopped her and ended the cross-examination.

¶ 13　　Respondent testified that she had recently gone to her grandchildren's school to make a donation and spoke to a woman who directed her to the school building. Respondent rang the bell and asked a different woman to whom she should make out the check. Respondent surmised that Andrea must have seen her. Respondent said that she also attended outdoor religious services offered by St. Joseph's during the COVID-19 pandemic, which left the school and church buildings shuttered. She asked one of the priests for permission to attend her granddaughter's first communion mass, and he told her that he could not keep her out of the church. She also participated in several parish health walks with other women from the congregation and attended a Christmas party sponsored by St. Joseph's, for which she had to purchase tickets at the parish office. She said she was shocked that she is effectively barred from attending events at the church and from being in downtown Libertyville. Respondent related that, after the emergency orders of protection were issued, an acquaintance stopped speaking to her.

¶ 14　　Respondent said that her relationship with Andrea was fine when she babysat Andrea's eldest child during the time Andrea and Brian lived in Chicago. When the child was three years of age, Andrea even introduced her to the child's teachers and placed her on the school's emergency

contact list. But Andrea changed a lot when respondent's mother became ill and passed away. Respondent loves her daughters and her grandchildren, and she knows her daughters love their father, but she guessed that they do not love her. She said she is worried because she and her husband are both in their seventies and her husband's health is declining.

¶ 15    On cross-examination, respondent said that she knew that Andrea and Brian blocked her from calling them, but she denied that she had ever changed her phone number. She said Andrea had given Jules a phone and did not block his number.

¶ 16    In her closing argument, respondent stated that she is not a threat to anyone. She sent cards and gifts for her grandchildren that were returned. She denied sitting in a car watching her grandchildren, stating that she had attended outdoor religious services at St. Joseph's all summer. She conceded that she attended Brian's brother's wedding service at a church in Chicago, but she also said that she was baptized at the same church, attended grammar school there, and was married there. Respondent saw nothing wrong with attending the wedding mass there, which is something that she and Jules did regularly.

¶ 17    The trial court found that the evidence was essentially undisputed and that it did not hear anything to refute the evidence elicited by petitioners. The court added that Andrea and Brian had a right to say who can and cannot have a relationship with their children. In each case, the court issued a two-year plenary order of protection that prohibited respondent from communicating with Brian, Andrea, and the children, directly or indirectly through third parties or social media, or from coming within 500 feet of the Grahams, their residence, St. Joseph's Catholic School and Church, and several other designated addresses.

¶ 18              B. Motions to Extend the Plenary Orders of Protection

¶ 19    On October 18, 2023, as the two-year plenary orders of protection were set to expire, Brian and Andrea each filed a motion to extend the order of protection in his or her favor. In his motion, Brian alleged that "[t]he harassment has not stopped," citing instances where respondent had allegedly gone to Andrea's hair salon during Andrea's appointments and appeared at events at which Andrea and Brian were present with their children, including an event in Mundelein at which the police were called, a family funeral, and a nephew's first communion. Brian asserted that respondent knew Andrea would be at the first communion, because Andrea is the child's godmother. He also alleged that respondent directed Jules to drive by their residence and attend school functions. Likewise, Andrea alleged that the "harassment has not stopped" in that respondent has visited places in the community that Andrea frequents, including the locations referenced by Brian. Andrea also alleged that respondent had directed Jules to attend events at the children's school and drive by their home.

¶ 20    The court set the matter for hearing on November 29, 2023, the date the initial plenary orders of protection were set to expire. At that hearing, Andrea testified that, in the months leading up to the issuance of the initial plenary orders in 2021, her children were "shaken" when they were around respondent. She referenced the incident where her daughter cried at the open house that respondent attended and stated that respondent had gone to weekly religious services at the school, prompting the school to escort the children out a special exit to avoid any interaction with respondent. Andrea testified that, during the same timeframe, the school told her that respondent "would come into the school and would speak with the administration on random occasions." For instance, she would go to the children's school to volunteer or donate to the church, which Andrea admitted is something grandmothers customarily do.

¶ 21    Andrea further testified that she and Brian contacted the police on September 2, 2022, when respondent was at a Carmel High School football game that the Grahams also attended. A video taken by Brian at that event was admitted into evidence. It depicts respondent and Jules with police officers as Brian remarks, "there's [respondent] getting escorted out of the Carmel game by a police officer." Carmel High School holds special significance to the Grahams because Andrea and Brian both attended the institution and their eighth-grade daughter "most likely will be going there as well."

¶ 22    Andrea testified that her relationship with respondent became estranged in the last five years because respondent harassed her for years by calling her and leaving messages until she blocked her phone number. Respondent also tried to contact Andrea through her work, her doctor, her extended family, and the children's school. Respondent did not respect boundaries, despite attempts at therapy to address the situation. Respondent's behavior was emotionally and mentally taxing for Andrea and her children. Before Andrea obtained the order of protection, friends and relatives told her that respondent had left multiple "manic" messages on their phones.

¶ 23    Andrea believed that, absent an extension, respondent would likely show up at the children's school, based on "her previous history and her pattern of behavior." Likewise, Andrea said that, "given the nature and the duration of how many years this was going on, it will just go right back to it if there is no order of protection in place." Andrea said she requested an extension because she "fear[ed] that if we don't have one, *** we'll just be dealing with what we dealt with leading up to this point two years ago." She opined that the "harassment will just pick back up" because the circumstances had not "changed at all" since the orders were issued two years ago.

¶ 24    On cross-examination, Andrea admitted that her children do not attend Carmel High School or play on its football team. Further, Andrea acknowledged that Carmel High School is not in

Libertyville (where she lives) and that it is not listed as a protected address in the orders of protection. Andrea also admitted that respondent does not know her family's schedule. Additionally, Andrea described an incident where respondent had allegedly walked into Andrea's sister's home, prompting her sister to call the Wauconda Police Department, but she admitted that the incident occurred five or six years ago, well before the orders of protection had been entered.

¶ 25 Andrea testified that the funeral she referenced in her motion was for Jules's sister—respondent's sister-in-law—and it took place at a church in Chicago, which was not covered by the orders of protection. Andrea claimed that she attended the wake but did not know whether respondent was there. Regarding the first communion for her sister's child referenced in the motion, Andrea said that it took place in May 2023. Andrea testified that respondent was not invited to the event but acknowledged that the church where the first communion was held was not covered by the orders of protection.

¶ 26 Andrea testified that respondent can be overbearing but admitted that respondent had never engaged in or threatened any physical violence or abuse. In the two years since the issuance of the orders of protection, respondent has not called Andrea, reached out through third parties or social media, driven by her home, or showed up at her children's school. Although St. Joseph's is located near downtown Libertyville, Andrea agreed that respondent was not prohibited from being in Libertyville. Andrea agreed that respondent abided by the orders of protection but opined that it was because she would be arrested if she did not. Andrea said that while the orders of protection are in place, if she were to go anywhere and see respondent, she would have respondent removed from the location by the police.

¶ 27 After Andrea's testimony, Brian and Andrea rested. Respondent moved for a directed finding. Respondent's attorney argued that "good cause" is required to support the extension of an

order of protection but that Brian and Andrea had shown only "unchanged circumstances," which was insufficient evidence of good cause. The trial court denied respondent's motion.

¶ 28   Respondent then called Brian as an adverse witness. Brian testified he had not liked respondent for 13 or 14 years and had never met anyone more difficult in his life. Brian admitted that he was happy when he saw respondent being removed from the Carmel High School football game by the police, because he thought she was going to be arrested. He stated that respondent had been at other football games that year "staring at [his] family very creepily." Brian admitted that he had not called the police on any of those other occasions, and he did not reference the incidents in his motion for an extension of his order of protection. Brian opined that Jules acted as respondent's "proxy" after the orders of protection were issued in that she would send him to attend mass at St. Joseph's and to drive through the family's neighborhood. Brian admitted that he had not heard any conversations during which respondent instructed Jules to serve as her proxy, but he suggested that respondent was controlling and kept Jules "hostage" in their home. Brian claimed that he had no reason to speak ill of respondent in the community, since "everybody" already knew that she is "nuts" because she has left voicemails for his mother, cousin, and brothers "ranting over and over again" and has showed up at their homes for "family" parties. Brian described respondent as "the most mentally disturbed person [he's] ever met in [his] life."

¶ 29   Respondent then called Jules to testify. Jules testified that he and respondent have been married for 46 years. Jules likes Brian but admitted that his relationship with Brian is "probably not the best" and has been "trying at times." He also said that his relationship with Andrea is "[n]ot as well as [he] would like it to be."

¶ 30   Jules was aware that orders of protection had been issued against respondent. Jules noted that he is not a named respondent in the orders of protection. Jules said that respondent has never

asked him to drive through the Grahams' neighborhood or go to St. Joseph's church. He also denied driving through the Grahams' neighborhood and reporting back to respondent.

¶ 31　　Jules testified that he and respondent generally attend one or two Carmel High School football games each season, as they had done on and off ever since his daughters went to high school there. A retired Army officer, Jules accompanied respondent to a Carmel High School game in September 2022 for Military Appreciation Day. In the second quarter, as he and respondent were sitting in the end zone area at the far end of the bleachers, two police officers approached and explained that the Grahams were in the stadium. Jules had not seen Andrea or Brian prior to the police approaching him and respondent, and he did not expect them to be there. He was there to see a football game and be recognized for his military service.

¶ 32　　When Jules's sister, Theresa Mattino, passed away, Jules and respondent attended her wake and funeral at a church in Chicago. He did not see Brian or Andrea at the wake, and he did not expect to see them at the funeral. He and respondent were there to pay their last respects to Mattino.

¶ 33　　Regarding the relationship between Andrea and respondent, Jules said it took a turn for the worse about seven or eight years ago, but he could not recall any event that precipitated its deterioration. Jules testified that respondent can be strong willed at times because "she has her own mind" but that he had never seen her threaten Andrea or Brian. The orders of protection, with all the restrictions they entail, had limited Jules's and respondent's lives and caused a lot of additional stress, especially given their ages and health. While he may not have agreed with the issuance of the orders of protection, respondent had abided by them.

¶ 34　　On cross-examination, Jules said that the orders of protection had put him "between a rock and a hard place." Jules watched the initial hearing on the orders of protection and heard the allegations of Andrea and Brian. He had not personally witnessed respondent make "incessant"

phone calls, send "incessant" e-mails, "persistently" reach out to the school, or drive by Andrea's home, but her behavior is "natural" to him. He agreed that he was close to Andrea when she was younger and said, "the little girl [he] knew *** she was a great little kid." He did not know Andrea to be a liar, but he had not seen her or talked to her in years, and he said, "[p]eople do change."

¶ 35　Following argument by the parties, the trial court stated that it had gotten a "flavor" of the reasons for the initial orders of protection. The court further remarked that Andrea's mannerisms suggested that the "situation that led up to this order of protection [*sic*] and the conduct by [respondent] *** certainly have caused a great deal of stress not only to [Andrea] but to the entire Graham family." After noting the incidents at the football game, the funeral, and the first communion, the court stated, "arguably at least for two of those *** there could have been potential criminal charges." The court stated that, when assessing "good cause," it had to both look at "the grounds for the original order of protection and combine that with things that have happened subsequently." The court then said:

> "I find that there is good cause here. So there is not a need for new and additional allegations, and there's not a need that there will be danger, but it's clear that the original harassment—and every one of the witnesses that testified today had a different word for it, but spirited, strong-willed, and those are—I think those words kind of speak to the character of [respondent] and the likelihood or the necessity of this order of protection."

The trial court therefore extended both orders of protection for an additional two years. In accordance with its ruling, the court completed written orders consisting of a preprinted form on which the court checked a box and entered a date. As completed by the trial court, the forms provide that "[a]n extension of the Order of Protection is granted and hereby extended to November 28, 2025 at 5:00 PM." This appeal by respondent followed.

¶ 36                                   II. ANALYSIS

¶ 37     We initially note that Brian and Andrea, as appellees, have not filed a brief in these appeals. However, because the record is straightforward and the claimed errors are such that we can decide them without the aid of an appellee's brief, we will consider the merits of the appeals on respondent's brief only. See *First Capitol Mortgage Corp. v. Talandis Construction Corp.*, 63 Ill. 2d 128, 133 (1976).

¶ 38     Respondent argues that the trial court's finding that Brian and Andrea demonstrated "good cause" to extend the orders of protection was against the manifest weight of the evidence. According to respondent, where, as here, she did not violate or threaten to violate the original orders of protection or engage in any other form of conduct that could give rise to relief under the Act, the trial court lacked "good cause" to extend the orders. Respondent further contends that the trial court's judgment must be reversed and the orders extending the plenary orders of protection vacated because neither the report of proceedings nor the trial court's orders contain the statutory findings required by section 214(c)(1) of the Act (750 ILCS 60/214(c)(1) (West 2020)). We find both contentions unavailing.

¶ 39                                   A. Good Cause

¶ 40     The Act is to be liberally construed and applied to advance its underlying purposes, which include supporting victims of domestic violence to avoid further abuse, reducing the abuser's access to the victim, and expanding the victim's civil and criminal remedies to effect physical separation from the abuser. 750 ILCS 60/102(4), (6) (West 2020); *People v. Leezer*, 387 Ill. App. 3d 446, 449-50 (2008). The Act provides for three types of orders of protection: emergency (750 ILCS 60/217 (West 2020)), interim (750 ILCS 60/218 (West 2020)), and plenary (750 ILCS 60/219 (West 2020)). The present case involves the extension of plenary orders of protection.

¶ 41 Section 219 of the Act states that a plenary order of protection "shall issue" if the petitioner has, among other things, satisfied the requirements of section 214 of the Act. 750 ILCS 60/219 (West 2020). In turn, section 214(a) of the Act (750 ILCS 60/214(a) (West 2020)) provides that an order of protection shall issue "[i]f the court finds that petitioner has been abused by a family or household member." A plenary order of protection not entered in conjunction with another civil proceeding, criminal prosecution, or delinquency petition "shall be valid for a fixed period of time, not to exceed two years." 750 ILCS 60/220(b)(0.05) (West 2020). Section 214(a) of the Act also provides that the modification or extension of a prior order of protection "shall be in accordance with this Act." 750 ILCS 60/214(a) (West 2020). In turn, section 220(e) of the Act (750 ILCS 60/220(e) (West 2020)) governs the extension of orders of protection. The first three sentences of section 220(e) provide as follows:

"Any emergency, interim or plenary order may be extended one or more times, as required, provided that the requirements of Section 217, 218 or 219, as appropriate, are satisfied. If the motion for extension is uncontested and petitioner seeks no modification of the order, the order may be extended on the basis of petitioner's motion or affidavit stating that there has been no material change in relevant circumstances since entry of the order and stating the reason for the requested extension. An extension of a plenary order of protection may be granted, upon good cause shown, to remain in effect until the order of protection is vacated or modified." 750 ILCS 60/220(e) (West 2020).

¶ 42 Relying on the statutory language cited above, respondent contends that section 220(e) distinguishes a motion for an extension of an order of protection that is uncontested and for which the petitioner does not seek a modification from any other motion for an extension. Respondent asserts that findings in an original order of protection can be the basis for extending an order of

protection, but only if the petition to extend is uncontested and the petitioner does not seek a modification of the order. However, if the petition to extend a plenary order of protection is contested, then, according to respondent, the petitioner must establish "good cause" for extending the order.

¶ 43    Respondent further contends that the legislature's specific requirement that a petitioner's declaration of no material change can suffice for an extension only if the request is "uncontested and petitioner seeks no modification of the order" supports the notion that additional evidence beyond the basis for the original order of protection is needed to show "good cause" for an extension in all other circumstances. Thus, respondent asserts that a petitioner must demonstrate that the respondent engaged in new or continuing acts of abuse or that the respondent violated the original order of protection. Turning to the present case, respondent reasons that the trial court improperly concluded that Brian and Andrea had established "good cause" for extensions of the orders of protection because the motions for the extensions were contested, the petitioners sought the extensions based on nothing more than "unchanged circumstances" (as opposed to "good cause"), she did not violate or threaten to violate the original orders of protection or engage in any other form of conduct that could give rise to relief under the Act, and the court's decision to extend the orders of protection was "based on the nature of the conduct that gave rise to the original orders of protection." According to respondent, the trial court therefore rendered the "good cause" requirement in section 220(e) meaningless.

¶ 44    To properly address respondent's argument, we must engage in statutory construction. The primary objective of statutory construction is to ascertain and give effect to the intent of the legislature. *State Bank of Cherry v. CGB Enterprises, Inc.*, 2013 IL 113836, ¶ 56. The most reliable indicator of legislative intent is the language of the statute itself, given its plain and ordinary

meaning. *State Bank of Cherry*, 2013 IL 113836, ¶ 56. Words and phrases must not be viewed in isolation but must be considered in light of other relevant provisions of the statute. *Gruszeczka v. Illinois Workers' Compensation Comm'n*, 2013 IL 114212, ¶ 12. The statute should be read as a whole and construed so as to give effect to every word, clause, and sentence; we must not read a statute so as to render any part superfluous or meaningless. *Palm v. Holocker*, 2018 IL 123152, ¶ 21. Only where the language of the statute is ambiguous, or where a literal interpretation of the statute would either lead to absurd results or thwart the goals of the statutory scheme, may a court look beyond the express language of the statute and consider extrinsic aids of construction. *Lansing v. Southwest Airlines Co.*, 2012 IL App (1st) 101164, ¶ 30; *NDC LLC v. Topinka*, 374 Ill. App. 3d 341, 359 (2007). Statutory construction is a question of law, subject to *de novo* review. *People v. Manning*, 2018 IL 122081, ¶ 16.

¶ 45    Examining the language of section 220(e), we observe that the first sentence provides: "Any emergency, interim or plenary order may be extended one or more times, as required, provided that the requirements of Section 217, 218 or 219, as appropriate, are satisfied." 750 ILCS 60/220(e) (West 2020). We read this first sentence to allow extensions of orders of protection provided the requirements for the type of order to be extended have been met. The second sentence states:

> "If the motion for extension is uncontested and petitioner seeks no modification of the order, the order may be extended on the basis of petitioner's motion or affidavit stating that there has been no material change in relevant circumstances since entry of the order and stating the reason for the requested extension." 750 ILCS 60/220(e) (West 2020).

The terms of the second sentence clearly apply only to those situations where the motion for an extension of an order of protection is uncontested and for which the petitioner does not seek a

modification. As to the second sentence, we agree with respondent that the statute clearly distinguishes a motion for an extension of an order of protection that is uncontested and for which the petitioner does not seek a modification from other motions for an extension, but we do not agree with respondent that the distinction entails varying the quantum of proof from "no material change in relevant circumstances" to "good cause shown." Instead, the second sentence of the statute merely allows *a relaxed method of proof* where the motion is uncontested and seeks no modification. See *Stapp v. Jansen*, 2013 IL App (4th) 120513, ¶ 15 (finding that the " 'no material change in circumstances' " language had "no application" where the hearing was contested); see also *In re Marriage of Botero*, 2023 IL App (1st) 221576-U, ¶ 28 (noting that the " 'no material change in relevant circumstances' " language in section 220(e) applies only when the petitioner seeks an uncontested extension of an order of protection (quoting 750 ILCS 50/220(e) (West 2020)). That provision, however, has no application where, as in this case, the extension was contested.

¶ 46 The third sentence of section 220(e) declares: "An extension of a plenary order of protection may be granted, upon good cause shown, to remain in effect until the order of protection is vacated or modified." 750 ILCS 60/220(e) (West 2020). With respect to contested motions, respondent insists that a petitioner must establish "good cause" for extending any and all plenary orders of protection. However, this reading suffers from some problems. First, it renders the references in the first sentence of the extension statute to "plenary order[s]" and to "Section *** 219," the statute concerning the requirements for the issuance of plenary orders, superfluous. 750 ILCS 60/220(e) (West 2020) ("Any emergency, interim or plenary order may be extended one or more times, as required, provided that the requirements of Section 217, 218 or 219, as appropriate, are satisfied."); 750 ILCS 60/219 (West 2020) (setting forth the requirements for the issuance of

plenary orders of protection). The first sentence of section 220(e) does not contain a "good cause" requirement.

¶ 47     Second, this reading of the statute also ignores the concluding language of the third sentence: "An extension of a plenary order of protection may be granted, *upon good cause shown, to remain in effect until the order of protection is vacated or modified*." (Emphasis added.) 750 ILCS 60/220(e) (West 2020). A reasonable person could read the third sentence of section 220(e) to apply a "good cause" requirement only to those requests for extensions of an indefinite duration, *i.e.*, an extension that is "*to remain in effect until the order of protection is vacated or modified*," as opposed to an extension of a fixed duration, not to exceed two years. (Emphasis added.) See 750 ILCS 60/220(e) (West 2020).

¶ 48     Considering the foregoing, we find the statute ambiguous. As a result of section 220(e)'s references to plenary orders, in the first and third sentences, the language is unclear as to whether, in a contested motion, an individual seeking the extension of a plenary order of protection is merely required to satisfy the requirements of section 219 of the Act (750 ILCS 60/219 (West 2020)) or whether "good cause" must also be shown. Stated differently, reasonably well-informed persons seeking the extension of an order of protection could interpret section 220(e) of the Act as setting forth different requirements to obtain an extension of a plenary order of protection depending on the duration of the extension. See *Krohe v. City of Bloomington*, 204 Ill. 2d 392, 395-96 (2003) (noting that a statute is ambiguous if it is capable of being understood by reasonably well-informed persons in two or more different ways). Accordingly, we look to an extrinsic aid of construction, the statute's legislative history, to resolve the ambiguity. *Lansing*, 2012 IL App (1st) 101164, ¶ 30; *NDC LLC*, 374 Ill. App. 3d at 359.

¶ 49 Effective January 1, 2009, the General Assembly amended the Act to add to section 220(e) the sentence that contains the "good cause" language. Pub. Act 95-886, § 10 (eff. Jan. 1, 2009) (amending 750 ILCS 60/220). Public Act 95-886 began as House Bill 5148 (95th Ill. Gen. Assem., House Bill 5148, 2008 Sess.). Though limited, the legislative history for House Bill 5148 is instructive. During debate on the bill, Representative William Davis, the sponsor of the bill in the House of Representatives, noted that there had been various news stories in which victims of domestic violence had been murdered. 95th Ill. Gen. Assem., House Proceedings, May 1, 2008, at 31 (statements of Representative Davis). This led to the introduction of a series of bills addressing issues of domestic violence. Representative Davis then stated in relevant part:

"I have introduced House Bill 5148, which essentially says that *** this allows that after a preliminary order of protection has been granted that if there is indeed good cause that that order of protection can be *** reinstituted *** so to speak, and that order of protection can remain indefinitely against that individual. Again, this is *** I feel yet another tool by which we can try to protect individuals who have been the unfortunate victims of domestic violence, and that is why I brought this piece of legislation." 95th Ill. Gen. Assem., House Proceedings, May 1, 2008, at 31-32 (statements of Representative Davis).

In the Senate, Senator Jacqueline Collins spoke on behalf of the legislation. She stated in pertinent part, "House Bill 5148 basically permits a court to grant an extension of a plenary order of protection to remain in effect until the order of protection is vacated." 95th Ill. Gen. Assem., Senate Proceedings, May 27, 2008, at 32 (statements of Senator Collins).

¶ 50 Given this legislative history, we conclude that the legislature intended to treat contested extensions of a plenary order of protection differently depending on the duration of the extension. If the extension is contested and is to remain in effect until vacated or modified, *i.e.*, of an

unspecified duration, the petitioner must establish "good cause" for the extension, in addition to meeting the requirements of section 219 of the Act. See *Dale v. Bennett*, 2021 IL App (4th) 200188, ¶¶ 36, 38 (noting that the plain language of the Act provides for an indefinite extension of a plenary order of protection "upon good cause shown" so that a victim need not appear in court every two years "simply to dredge up their terror before the court to explain why the order remains necessary"). Conversely, if an extension is contested and for a fixed period not exceeding two years, the "good cause" requirement is not implicated, and the plenary order may be extended if the requirements of section 219 are satisfied. 750 ILCS 60/220(e) (West 2020). In this case, the motions to extend the plenary orders of protection were contested. Although Brian and Andrea did not specify in their motions a duration for the extensions, the trial court extended the initial plenary orders of protection for a fixed duration of two years. Under these circumstances, the "good cause" requirement in section 220(e) was not triggered. Brian and Andrea needed only to satisfy the requirements of section 219 to obtain the extensions.

¶ 51   Before proceeding further, we recognize that prior unpublished appellate court decisions have suggested that a petitioner must establish "good cause" to extend *any* contested plenary order of protection, irrespective of its duration. See *Botero*, 2023 IL App (1st) 221576-U (concluding that the trial court's decision to extend contested plenary order of protection for an additional two years was against the manifest weight of the evidence because the petitioner failed to establish "good cause" for the extension); *In re Marriage of Goodman*, 2020 IL App (2d) 200289-U (same). However, as these cases did not distinguish between the requirements for an extension of a contested plenary order of protection for an indefinite duration and the requirements for an extension of a contested plenary order of protection for a fixed period of time (not to exceed two years), we decline to adopt the reasoning of those cases.

¶ 52    Returning to the case at hand, as noted earlier, section 219 of the Act states that a plenary order of protection "shall issue" if the petitioner has, among other things, satisfied the requirements of section 214 of the Act. 750 ILCS 60/219 (West 2020). In turn, section 214(a) of the Act (750 ILCS 60/214(a) (West 2020)) provides that an order of protection shall issue "[i]f the court finds that petitioner has been abused by a family or household member." Relevant here, the Act defines "abuse" as "physical abuse, harassment, intimidation of a dependent, interference with personal liberty or willful deprivation." 750 ILCS 60/103(1) (West 2020). The Act defines "harassment" as "knowing conduct which is not necessary to accomplish a purpose that is reasonable under the circumstances; would cause a reasonable person emotional distress; and does cause emotional distress to the petitioner." 750 ILCS 60/103(7) (West 2020). Further, under the statute, certain types of conduct are presumed to cause emotional distress unless rebutted by a preponderance of the evidence, including "creating a disturbance at petitioner's place of employment or school"; "repeatedly telephoning petitioner's place of employment, home or residence"; "repeatedly following petitioner about in a public place or places"; and "repeatedly keeping petitioner under surveillance by remaining present outside his or her home, school, place of employment, vehicle or other place occupied by petitioner or by peering in petitioner's windows." 750 ILCS 60/103(7)(i)-(iv) (West 2020).

¶ 53    The standard of proof in a proceeding to obtain an order of protection is proof by a preponderance of the evidence. 750 ILCS 60/205(a) (West 2020); *Best v. Best*, 223 Ill. 2d 342, 348 (2006); *Stapp*, 2013 IL App (4th) 120513, ¶ 15. Proof by a preponderance of the evidence means that the facts at issue are rendered more likely than not. *People v. Urdiales*, 225 Ill. 2d 354, 430 (2007); *People v. Houar*, 365 Ill. App. 3d 682, 686 (2006). When the trial court makes a finding by a preponderance of the evidence, a reviewing court will overturn the trial court's finding only

if it is against the manifest weight of the evidence. *Best*, 223 Ill. 2d at 348-49; *Stapp*, 2013 IL App (4th) 120513, ¶ 16. A finding is against the manifest weight of the evidence only if an opposite conclusion is clearly apparent or if the finding is unreasonable, arbitrary, or not based on the evidence presented. *In re Marriage of Romano*, 2012 IL App (2d) 091339, ¶ 44.

¶ 54 In this case, we cannot say that the trial court's decision to extend the initial plenary orders of protection for an additional two years was against the manifest weight of the evidence. The evidence of record supports a finding that respondent's conduct constitutes "abuse" as that term is defined in the Act. Notably, respondent engaged in "harassment." In this regard, the record demonstrates that, prior to the issuance of the original plenary orders of protection, Brian and Andrea cut off all communication with respondent after joint counseling efforts proved unproductive. Nevertheless, respondent repeatedly attempted to contact Andrea by telephone even after Andrea blocked her calls. Respondent also repeatedly attempted to contact Andrea by e-mail or through other means, including her job, her doctor, her extended family, and the children's school. Respondent would also drive by the Graham residence daily, attend family and school events uninvited, and go to weekly religious services at the children's school, prompting the school to take measures to prevent contact between respondent and the children. Andrea testified that respondent's behavior impacted her and the Graham children mentally and emotionally, discouraged the children from going outside, and caused the Graham children to live in fear of an unexpected encounter with respondent. Brian also testified about the impact of respondent's behavior on the children. Moreover, following the issuance of the original orders of protection, respondent continued to appear at locations where Andrea or Brian were present. Even if the church where the Grahams' nephew's first communion was held was not covered by the orders of protection, respondent should have known that the Grahams would be attending the event, given

that Andrea is the child's godmother. Moreover, respondent did not refute allegations that she showed up at the hair salon Andrea patronized during Andrea's appointments. Andrea feared that, absent extensions of the plenary orders of protection, respondent would revert to her previous pattern of behavior. In light of this history, the trial court found the Grahams' concerns justified and extended the plenary orders of protection for an additional two years. Given the record before us, we cannot say that a conclusion opposite that of the trial court is clearly apparent or that the trial court's finding is unreasonable, arbitrary, or not based on the evidence presented.

¶ 55    Respondent insists that the trial court's decision to extend the orders of protection was improper because it was based on her conduct prior to the issuance of the original orders of protection, without regard to any evidence of new harassment. Respondent claims that she did not violate or threaten to violate the original orders of protection or engage in any other form of conduct that could give rise to relief under the Act. Respondent's arguments are not well taken. First, as we set forth above, because the extensions of the plenary orders of protection were contested and of a fixed duration not to exceed two years, Brian and Andrea needed only to satisfy the requirements of section 219. We read nothing in section 219 that prohibits the trial court from extending a plenary order of protection based on the conduct that formed the basis for the initial plenary orders. Second, the trial court did reference evidence of new harassment, including respondent's attendance at the Grahams' nephew's first communion. Respondent contends that, because none of the evidence adduced at the underlying hearing suggests that any of the encounters between her and the Grahams resulted in any actual interaction between the parties, it is insufficient to support an extension. We reject this argument, as it would thwart the purposes of the Act and render orders of protection meaningless.

¶ 56                          B. Trial Court's Factual Findings

¶ 57 Respondent also argues that the trial court's judgment must be reversed and the orders extending the plenary orders of protection vacated because the trial court failed to make the statutory findings required by section 214(c)(1) of the Act (750 ILCS 60/214(c)(1) (West 2020)).

¶ 58 As noted above, section 220(e) of the Act provides that an extension of a plenary order of protection may be granted provided that the requirements of section 219 of the Act are satisfied. 750 ILCS 60/220(e) (West 2020). In turn, section 219 of the Act states that, for each remedy requested, the petitioner must establish that the requirements of section 214 are satisfied. 750 ILCS 60/219 (West 2020). Subject to an exception not applicable here, section 214(c)(3) of the Act provides that, before granting a specific remedy, the trial court is required to make certain findings in "an official record or in writing." 750 ILCS 60/214(c)(3) (West 2020); *Landmann v. Landmann*, 2019 IL App (5th) 180137, ¶ 14. The statute states that "at a minimum" the court shall set forth that it had considered (1) the applicable relevant factors described in section 214(c)(1) and (c)(2) of the Act (750 ILCS 60/214(c)(3)(i) (West 2020)), (2) whether the respondent's conduct or actions will likely cause irreparable harm or continued abuse unless prohibited (750 ILCS 60/214(c)(3)(ii) (West 2020)), and (3) whether it is necessary to grant the requested relief to protect the petitioner or other alleged abused persons (750 ILCS 60/214(c)(3)(iii) (West 2020)). Factors for consideration under section 214(c)(1) include the following:

> "(i) the nature, frequency, severity, pattern and consequences of the respondent's past abuse, neglect or exploitation of the petitioner or any family or household member *** and the likelihood of danger of future abuse, neglect, or exploitation to petitioner or any member of petitioner's or respondent's family or household; and

(ii) the danger that any minor child will be abused or neglected or improperly relocated from the jurisdiction, improperly concealed within the State or improperly separated from the child's primary caretaker." 750 ILCS 214(c)(1)(i)-(ii) (West 2020).

Although not at issue in this appeal, section 214(c)(2) of the Act sets forth factors the court must consider when the case involves the loss of possession of a family home by one party. 750 ILCS 60/214(c)(2) (West 2020). The failure to make the required statutory findings constitutes reversible error. See, *e.g.*, *Landmann*, 2019 IL App (5th) 180137, ¶ 14; *People ex rel. Minteer v. Kozin*, 297 Ill. App. 3d 1038, 1043-44 (1998); *In re Marriage of Henry*, 297 Ill. App. 3d 139, 143-44 (1998). But see *Hedrick-Koroll v. Bagley*, 352 Ill. App. 3d 590, 594 (2004) (remanding matter for trial court to set forth the findings mandated by section 214(c) of the Act).

¶ 59   Respondent asserts that neither the report of proceedings from the trial court nor the form orders indicate that the trial court considered the section 214(c)(1) factors (750 ILCS 60/214(c)(1) (West 2020)). We agree with respondent that the form orders entered by the trial court do not contain the findings required by section 214(c)(1) (750 ILCS 60/214(c)(1) (West 2020)). The court merely checked a box stating that an extension of the plenary orders of protection had been granted and entered the expiration date of the extension. But, while the trial court did not expressly state that it had considered the section 214(c)(1) factors, our review of the report of proceedings establishes that it did consider them. Therefore, the "official record" contains the required findings.

¶ 60   Relevant here, section 214(c)(1) directs the trial court to consider (1) the nature, frequency, severity, pattern, and consequences of the respondent's past abuse; (2) the likelihood of danger of future abuse; and (3) the danger that any minor child will be abused. 750 ILCS 5/214(c)(1) (West 2020). Here, while the trial court's remarks in deciding whether to grant the extensions were neither extensive nor pointedly responsive to the statutory factors, we conclude that they

adequately satisfied the requirements of section 214(c)(1). The trial court commented that it had to both look at "the grounds for the original order [*sic*] of protection and combine that with things that have happened subsequently." The court also stated that it had gotten a "flavor" of the reasons for the initial order of protection and that Andrea's mannerisms suggested that the situation "caused a great deal of stress" to the entire Graham family. These remarks establish that the court considered the nature, frequency, severity, pattern, and consequences of respondent's past abuse. The court also concluded that "the original harassment" and respondent's "spirited" and "strong-willed" character supported the "necessity" of the extensions. These comments establish that the court considered the likelihood of danger of future abuse. Finally, the court's reference to the stress the situation has caused the entire Graham family establishes that the trial court considered the impact of any contact between respondent and the Graham children and hence the danger that any child will be abused.

¶ 61 We also point out that the written orders extending the plenary orders of protection continued in effect the orders entered on November 29, 2021, which granted the initial plenary orders of protection. The initial plenary orders of protection specifically state that the court had considered the relevant factors set forth in section 214(c)(1). See *Mowen v. Holland*, 336 Ill. App. 3d 368, 375-76 (2003) (holding that findings of emergency order of protection were effectively incorporated into plenary order). This also buttresses our conclusion that the statutory mandates were honored.

¶ 62 Accordingly, we decline to reverse the decision of the trial court on the basis advanced by respondent or remand the cause solely for the purpose of requiring the trial court to expressly state in a written order that it had considered the relevant applicable factors. See *In re T.H.*, 354 Ill. App. 3d 301, 312 (2004) (declining to remand cause solely for the purpose of having the trial court

reiterate its oral section 214(c)(1) findings in a written order), *overruled on other grounds by Best*, 223 Ill. 2d at 350.

¶ 63                                    III. CONCLUSION

¶ 64    For the reasons stated, we affirm the judgment of the circuit court of Lake County granting petitioners' motions to extend the original plenary orders of protection entered on November 29, 2021, for an additional two years.

 ¶ 65   Affirmed.

*Graham v. Van Rengen*, 2024 IL App (2d) 230611

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Lake County, Nos. 21-OP-2175, 21-OP-2176; the Hon. George T. Pappas, Judge, presiding. |
| **Attorneys for Appellant:** | John W. Radosevich, of Del Re Law Group, of Waukegan, for appellant. |
| **Attorneys for Appellee:** | No brief filed for appellees. |