2025 IL App (2d) 240369
No. 2-24-0369
Opinion filed May 20, 2025

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| HANNAH ELIZABETH MONTELAURO, | ) | Appeal from the Circuit Court |
| | ) | of Kendall County. |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | No. 24-OP-82 |
| | ) | |
| JACK NICHOLAS LUTKUS, | ) | Honorable |
| | ) | Jody Patton Gleason, |
| Respondent-Appellant. | ) | Judge, Presiding. |

JUSTICE McLAREN delivered the judgment of the court, with opinion.
Justices Birkett and Mullen concurred in the judgment and opinion.

**OPINION**

¶ 1    Respondent, Jack Nicholas Lutkus, appeals from an order of the circuit court of Kendall County granting a plenary order of protection to petitioner, Hannah Elizabeth Montelauro. Respondent argues that (1) the trial court's finding that respondent abused petitioner—by harassing her and interfering with her personal liberty—was against the manifest weight of the evidence and (2) the court failed to consider the statutory factors required by section 214(c) of the Illinois Domestic Violence Act of 1986 (Act) (750 ILCS 60/214(c) (West 2022)), which consideration, he claims, would not support the entry of the order of protection. We affirm.

¶ 2                          I. BACKGROUND

¶ 3        On March 15, 2024, petitioner filed a petition for an order of protection against respondent. It is undisputed that (1) petitioner and respondent dated for less than six months in 2022, (2) they never lived together, and (3) their relationship ended on September 24, 2022.

¶ 4        The trial court denied an emergency order of protection but scheduled the case for a plenary hearing. The plenary hearing took place on May 15, 2024. Petitioner testified as follows. Her relationship with respondent ended on September 24, 2022. Before that, she made two other attempts to break up with him. The first attempt took place at her residence in September 2022. Petitioner testified that she had gathered respondent's personal items from her basement and brought them upstairs to the living room couch. She told respondent that she was no longer happy and wished to move on with her life. According to petitioner, "[respondent] basically started crying, yelling, you know, how could I do this to him, fell to the floor, and just completely surprised me with his behavior." Respondent "begg[ed] [her] to reconsider." Petitioner and respondent "had plans throughout the rest of the month for various events," and respondent asked "if [they] could continue those in order for him to win [her] over." Petitioner testified that, although she did not "want to stay in the relationship," she and respondent "did not end the relationship that *** time." Respondent moved his items from the couch back to the basement.

¶ 5        Petitioner testified that she made a second attempt to end her relationship with respondent later in September 2022, again at her residence. She gathered up respondent's items but left them in the basement so as not "to trigger him again." When asked about the content of their conversation, petitioner testified:

> "I said that I still wanted to break up. That I didn't want to continue with the events we had planned. I believe we had planned to go to the Sandwich Fair together. We had also

planned to go to Riot Fest together, and some other concerts. And I had expressed that I had no longer wanted to attend these events with him."

According to petitioner, respondent again pleaded with her to reconsider and to attend the events with him to see if he could change her mind. When counsel asked petitioner if she felt like she "had *** a choice to say no" and break up with respondent, petitioner testified that she was afraid that respondent would react the same way he did the first time she attempted to end their relationship. She agreed to stay in a relationship with respondent. Nevertheless, petitioner asked respondent "to limit his communications with [her], limit texting, calling, et cetera." According to petitioner, she stated that she wanted "space."

¶ 6    Petitioner testified that respondent did not "leave [her] alone" as requested. Over the course of about a week, respondent left 10 voicemail messages for petitioner. The recordings were admitted as petitioner's exhibit Nos. 1 through 10 and played for the trial court. Petitioner confirmed that it was respondent's voice on the recordings.

¶ 7    Petitioner's exhibit No. 1, dated September 12, 2022, is 2 minutes and 52 seconds long. In the message, respondent expressed confusion over why he was "blocked," stated that his "trust level" was "iffy," was confused over what he "[had] done," was uncertain how he was "gonna be able to contact [petitioner] on Saturday to *** pick her up," and said repeatedly that he did not want to "bother" her. He hoped that "everything goes well" for her.

¶ 8    Petitioner's exhibit No. 2, dated September 12, 2022, is 30 seconds long and is a continuation of respondent's previous voicemail, which had been cut off. He stated that "it just hurts," that he loved petitioner, and that he would see her on Saturday.

¶ 9    Petitioner's exhibit No. 3, dated September 12, 2022, is 1 minute and 21 seconds long. Respondent stated that he "wants to respect" petitioner and that they "can just be friends." He said,

"If you still have my hydration pack, I'm wondering if I'm still picking you up on Saturday and Sunday." He stated that he was not going "to argue or beg for [her] back." He stated that he "just want[s] some of [his] stuff back and to just be friends with [her]." He said that she could use the hydration pack. He wanted to "hang out on Saturday." He also stated that they had "made plans for Saturday and then [he] got the note," so he was "kinda confused." The fact that she still had the hydration pack "makes [him] think [she] still wants him to come."

¶ 10    When questioned by counsel, petitioner explained that, at the time of the message, she had respondent's hydration pack because she had forgotten to return it to him.

¶ 11    Petitioner's exhibit No. 4, dated September 16, 2022, is three minutes long. Respondent stated that they "need to talk in person" and that he "need[s] closure." He complained that they never talked about "any sort of solutions" and that petitioner "never even talked to [him] that [she] had a problem with [him]." He admitted that he "f*** up"; he "even went into work and apologized to Allie." He needed to talk to petitioner because "this was out of nowhere." He stated that her "blocking [him] was excessive" and was "the only reason [he] tried contacting [her]." He felt that it was "even crazier that [she] blocked [him]." He criticized petitioner's refusal to talk to him. He stated that he knew that it was "all [his] fault." He complained that he had received no "notice" and that they "never talked."

¶ 12    When questioned by counsel, petitioner testified that it was not true, as respondent suggested in the voicemails, that he "had no idea that this was coming, that [she] wanted to break up." Petitioner explained that "Allie" was one of petitioner's best friends and that they used to work together at Starbucks inside the Yorkville Target. Petitioner testified that there were never any incidents between her and respondent at Target. However, she stated that respondent came

into Target a "handful of times" and that she had a "protective order in place through the security team at Target, because [she] was afraid of any sort of confrontation that would happen at work."

¶ 13    Petitioner's exhibit No. 5, dated September 16, 2022, is 2 minutes and 33 seconds long. Respondent repeatedly asked what he had "done." He stated that he had been working with his counselor and that he did not have an alcohol problem. He stated that he "just wants answers" as to what he was "doing wrong" and that he would "leave [her] alone after [he] get[s] answers." He questioned why they could not "fix this." He complained that petitioner never told him that she had "an issue with [him]." He was "upset that [they] never worked through [their] issues." He complained that they "never even tried."

¶ 14    Petitioner's exhibit No. 6, dated September 16, 2022, is three minutes long. Respondent stated that it was his "last phone call." Respondent said that he was "okay" with being "a really good friend of [hers]." He repeatedly complained that they "never tried" and "never talked about [their] issue." Respondent stated that he had "f***ed up immensely" and had "pushed [her] away." He reminded petitioner that she wanted to be his wife one day. He stated that their "time apart will only bring [them] together." He again stated that this was his "last message" and his "last attempt." He "would like to talk to [her] in person." He wanted "closure." He noted that he had some of petitioner's things and that petitioner had some of his things. He again apologized.

¶ 15    Petitioner's exhibit No. 7, dated September 16, 2022, is three minutes long. Respondent referenced the impending "Riot Fest." He apologized and stated, "I know I'm not going with you." He stated that he hoped they would continue with their other plans, even if it were just as "friends." He asked that they "come together" to exchange each other's items. He agreed that they needed "space." He hoped that petitioner would "eventually come back to [him]" and that she had "read through the packet" that he had given her. He stated that he felt "empty" and was sorry that he hurt

her. He stated that she would be "Hannah Elizabeth Lutkus" one day, that she was "heaven," that he missed her every day, and that, "every second [he] was with [her], [he] loved [her] more." He stated that he did not "do things right." He concluded with, "I love you forever and miss you. My one and only Hannah Elizabeth."

¶ 16    Petitioner's exhibit No. 8, dated September 16, 2022, is 1 minute and 18 seconds long. Respondent can be heard crying. He stated, "I hope you're having a good time. I hope you're having a good time. I—I love you and I'm sorry. I'm sorry." He also said, "I'll forever miss you." He continued apologizing and repeatedly stated, "Goodbye."

¶ 17    Petitioner's exhibit No. 9, dated September 17, 2022, is three minutes long. Respondent began with an apology. He referenced his therapist and problems at home. He talked about his plans for petitioner and him: they would attend various concerts and she was "going to fall in love with [him] again." He stated that he never meant to push her away or "talk s*** to Allie." He talked about his depression and how he is stronger now that he has gotten help. He told petitioner that he loved her and that she had "something coming in the mail." He said that he would "try [his] best" not to talk to her. He stated that he was "sorry" and would "love [her] forever."

¶ 18    Petitioner's exhibit No. 10, dated September 18, 2022, is three minutes long. Respondent stated that he "[was] here" and "f*** miserable." He stated, "I can only wish that I was here with you." He was "numb." He wanted them to be "friends." He stated that he was "not obnoxious" and "not an abuser." He knew that she needed "time." He stated that he "got [her] some stuff at the fest." He wished that she would understand that he had "intrusive thoughts" and said "mean things." He asked where the "forgiveness" was. He wanted to be "friends with [her] someday." He asked: "Why didn't we ever try to fix things while we were dating?" He stated that "nothing [was]

going to make [him] happy anymore." He concluded: "F*** this, f*** everyone. I'm f*** done with life. I hate everything. I just feel numb and hate everything."

¶ 19   Petitioner testified that the voicemails made her feel "disrespected." She stated that she "repeatedly asked for space, and [her] requests were continuously denied." The messages "left [her] fearful for what this would escalate to."

¶ 20   Petitioner testified further that, during this period in September 2022, she also received text messages from various phone numbers that she did not recognize. The messages were admitted as petitioner's group exhibit Nos. 12, 13, 15, and petitioner's exhibit No. 16. During this time, petitioner had blocked respondent's phone number. However, she knew that the messages were from respondent, based on their content.

¶ 21   The text messages contained in petitioner's group exhibit Nos. 12, 13, and 15, each sent from a different number, were generally similar in tone to the content of the voicemails. For instance, the messages included statements such as "I will always love you," "Please come back to me one day I will be waiting," and "After time I hope you come back to me." One message stated, "We both have each other's stuff we will figure that out for now I'll leave you alone the rest of the week until Saturday when we arranged for me to pick you up." Another stated, "We can still go as friends if you'd wish. This [number] won't work for long[.] I'm just wanting to respect you but I'm sent a mixed message. I hope you're okay." Another stated that "it's very confusing to me" and "Let me know so I know whether or not it's bye forever. We can be friends." Petitioner's exhibit No. 16 was a text message containing a "YouTube link." Petitioner testified that it was "a link to a song that [respondent] had shown her while they were dating."

¶ 22   When counsel asked petitioner how she felt when she received the text messages from whom she believed to be respondent, she replied:

"Again, I felt disrespected. I was unnerved by the lengths that he was going to communicate with me after I had asked him to give me space, after I had blocked his phone number. He was now using alternative methods."

¶ 23    Petitioner testified regarding an incident that occurred between her and respondent on the evening of September 24, 2022. Petitioner was in her basement and respondent was outside, standing at the partly open sliding glass door. Petitioner told respondent "that [they] were broken up, that [she] did not wish for him to contact [her] anymore, that there would be no more contacting [her], otherwise, [she] would pursue an order of protection."

¶ 24    Petitioner testified that she recorded the parties' conversation using her cell phone. A copy of the recording was admitted as petitioner's exhibit No. 11. The 14½-minute recording was played for the trial court.

¶ 25    The video recording depicts a mostly blocked view, but the parties' voices can be heard clearly. Petitioner told respondent that she would not let him into her house. She told him to stop coming to her house and showing up at her work. Petitioner referenced Allie. Petitioner told respondent that she did not want him in petitioner's house. She then demanded that he get out of her house (there was a sound of movement, as if she were trying to physically keep him out of the house), and she also threatened several times that she would scream. Respondent stated, "You said that you'd kiss me." Petitioner responded, "I've been lying to you a lot the past few weeks." She told him to take his hand off her and again stated that she would scream. She asked him several times to step back. He asked her to tell him what he did. She told him, "Everything that has happened since our breakup has been completely inappropriate." Petitioner stated that she knew that he got "her letter," because he texted her about it. Petitioner emphasized that the letter made him aware that she wanted space.

¶ 26    Petitioner commented on the fact that she had blocked respondent and that he was texting her from numbers that were not his. Respondent could be heard crying. She told him again to get out of her house and yelled out for her mother. Petitioner stated, "I have made it clear that I do not want to hear from you. That I do not want to see you." Petitioner told respondent that, if he did not stop contacting her, she would obtain an order of protection. Petitioner told respondent that he was banned from Target. Respondent insisted that he had the right to go to Target, but he said that he would leave if he saw her at Starbucks. Respondent asked petitioner not to "make this a legal issue." Petitioner stated that the way he had been acting scared her and that she did not know how else to tell him that she wanted him to leave her alone. Petitioner told respondent that, as long as he did not bother her, she would not pursue an order of protection. She stated that she wanted "to avoid it at all costs." Petitioner referred to respondent harassing Allie.

¶ 27    Respondent commented on petitioner "blocking" him. He said, "I know you come back to people, and I know that you know how therapy works." He then asked petitioner whether, if he promised to continue therapy, she would "eventually unblock [him] and [they] will eventually be able to be civil." Petitioner responded, "We'll see, and I mean that genuinely." Respondent stated that he was not trying to scare petitioner, and petitioner responded, "Yeah, well, you have scared me." Respondent asked for a hug, and petitioner said no. She said, "I don't want you to touch me ever again." She also said, "This is it. If I see you around here, if you come in my house right now, I will scream again. I will run. Take your hand off my door."

¶ 28    Respondent again insisted that he had the right to go to Target, and petitioner responded that she had talked to management. Respondent stated that he was at Target that day. Petitioner told him that he was making people at Target uncomfortable. Respondent stated, "I can change my look pretty quickly." He said that he has "the right to go to Target." Petitioner stated that she did

not want to see him around her residences and that she did not want him to contact her. She stated, "I just don't want to hear from you whatsoever." She asked him to leave and stated, "I told a lot of lies recently, for my sake." Petitioner closed the door, and the video concluded.

¶ 29    After the video was played for the trial court, petitioner confirmed that, during the video, respondent attempted to enter her residence multiple times, which made her feel "[v]ery frightened." When petitioner told respondent in the video to take his hand off her, his hand was on her right wrist. He did not release her when asked.

¶ 30    Petitioner testified that, three months later, in December 2022, she received text messages from respondent. The messages were admitted as petitioner's group exhibit No. 17. The initial text message was received on Christmas Day and expressed Christmas greetings. Petitioner responded, "Merry Christmas." A subsequent message referenced, among other things, how "[i]t shouldn't have ended in a ridiculous misunderstanding." Petitioner realized from the content of the second message that both messages were from respondent. She responded, "I hope you know the only reason I responded on Christmas was because I thought you were a family member whose number I didn't have. I've moved on from this. Don't make me regret not getting an [order of protection]. Lose my number."

¶ 31    Petitioner testified that, in February or March 2023, she received additional text messages from respondent. The trial court admitted the text messages as petitioner's group exhibit No. 18. In the texts, respondent asked petitioner several times if they could talk. When petitioner declined, respondent stated that he wanted to apologize and "ask [her] about someone close to [her]." Petitioner responded, "If you want to talk[,] call me on your real number." Petitioner testified that she then had about "[a]n hour, an hour-and-a-half" phone conversation with respondent. When asked why she spoke to respondent after she had sent all the messages telling him to leave her

alone, she stated that "the fact that he had mentioned that he had information about someone [she] cared about had [her] worried." She would not have agreed to talk to him otherwise. During the conversation, respondent updated her on what had happened in his life since their breakup. He also mentioned talking to petitioner's coworker. However, petitioner testified, the only information he had mentioned about someone close to her was "[j]ust that he wanted to f*** [her] friend." When counsel asked petitioner how that made her feel, she responded, "Disgusted." The conversation ended with her telling him that "this was a one off thing" and that she "did not want him to contact [her]." She told him that she still had him "blocked on everything" and that her "life [was] better off without him."

¶ 32   Petitioner testified that, about a year later, in February 2024, respondent contacted her on Snapchat. The trial court admitted the Snapchat messages as petitioner's group exhibit No. 19. Petitioner testified that the messages were sent from the username "John Ray 74"[1] but that she knew from their content that respondent sent them. He wrote, "Hey hottie wyd." Petitioner replied, "[Respondent], cut the crap, what do you want from me." Respondent asked if they could talk later, stating that he was "a semi decent person now." Petitioner responded, "If you're so hell bent on it, you don't deserve my time regardless." Respondent asked, "Hell bent on what?" Petitioner responded, "Talking to me." Respondent replied, "Lmao I have reasons," and sent a photo. The photo depicted petitioner naked. According to petitioner, she had sent that photo to respondent during their relationship. Petitioner replied, "It's been a year and you said you wouldn't bother me again. F*** you." The parties exchanged a few more messages. Respondent told petitioner that he

---

[1]The exhibit depicts the username as "jonrace74."

had "a few questions" and "wanted to tell [her] some things." The final message was a photograph of respondent with the words "I won't bother just add my real info back" typed over it.

¶ 33    Petitioner testified that she felt "[s]cared, very defeated" by respondent's Snapchat messages. She "felt extremely violated" and "no longer wanted [respondent] to have that explicit image of [her]." When asked how she would feel if an order of protection were not granted, she stated:

> "I would feel very afraid. Ever since [respondent] has come back into my life, I've been through the fear that I had almost two years ago where I'm always wondering if he's just going to show up, if he's going to figure out where I am now. Especially after all this, you've just listed out where I'm currently employed, where I'm currently residing.
>
> I'd be afraid that if this didn't go through, he would show up there for retaliation at the threat that this has posed to him."

¶ 34    On cross-examination, respondent's counsel inquired about the video recording that petitioner made on the evening of September 24, 2022. Petitioner testified that she and respondent spoke at her home before she began recording the video; he was at her home for about an hour in total before she ended the recording and he left. While she was recording, she held the phone in her hand, pointing it down. She did not tell respondent that she was recording, because she thought that would "put [her] in danger." Respondent's counsel followed up with this questioning:

> "Q. Okay. Even though you had spent approximately an hour with him in the time leading into the video?
>
> A. When we were together for the hour before, he didn't realize that I was going to completely cut-off communication then. He thought we were on good terms still, you know, good in whatever this limbo of our relationship was.

It was—I started recording because I was going to say, I don't want you to contact me anymore, and I was scared of how he'd react to that, given his previous reactions to me wanting to break up."

¶ 35    Respondent's counsel also inquired about a letter that petitioner had sent to respondent, which she referenced in the video recording. In response to petitioner's comment that she thought respondent was "delusional," the following colloquy occurred:

"Q. [BY RESPONDENT'S COUNSEL]: ***

Do you think that that might have been brought on by the fact that you also sent him a letter saying that you loved him?

A. I said that I wanted him to leave me alone.

Q. But you recognize though that within the video you referenced the letter, I know you got my letter, [respondent], right? And that letter included your expressions of, let's say, love or affection.

A. Okay. That letter, first and foremost, said that I wanted to be left alone.

I can still care about someone, love them, but not want to be in a relationship with them, not want to be involved with them.

I used to care about him."

¶ 36    In respondent's case-in-chief, respondent agreed that the parties broke up "in or around September of 2022." He claimed that they broke up because she cheated on him. He acknowledged prior occasions where petitioner attempted to break up with him. He became emotional the first time they discussed breaking up, because he learned that she had cheated on him. They did not break up that time because he was "okay with that fact and wanted it to still continue." Respondent did not recall the second time that petitioner attempted to break up with him, but he did recall the

incident depicted on the video. About one week passed between petitioner's first attempt to break up with him and the incident on the video. During that interval, he left "certain voicemails" because he was concerned about his "stuff" and the concert they had planned to attend at the end of the week. He had no reason to believe that they were not going to the concert together. He left the voicemails because he had no other way to communicate with her. However, he could not recall why he was otherwise unable to communicate with her. He was "sad" and "very confused" when he left the voicemails, because he "was misled that the relationship may continue." He asserted that, contrary to petitioner's testimony, he did not know that their relationship had ended. Respondent did not recall "grabbing [petitioner's] wrist" in the video. He stated, "It was to go in as of [*sic*] to kiss her." Respondent claimed that petitioner told him "[b]efore the video" that he could kiss her—as he remarked on the video. Respondent believed, after their conversation on September 24, 2022, that petitioner was open to rekindling their relationship eventually, based on her saying, "We'll see, and I mean that genuinely," on the video. Respondent testified that, before their conversation on September 24, 2022, petitioner sent him a letter that "talked about some of the good times [they] had together, as well as professing that she still loved [him]."

¶ 37 Respondent testified that he was not aware of any protective order that prevented him from visiting Target. He never went out of his way to speak to petitioner at Target after they broke up. When asked why he sent petitioner the text on Christmas, he stated that he "was probably wishing many people Merry Christmas at the time." He testified that, when he spoke with petitioner in March 2023, they discussed one of her coworkers, whom he was interested in getting to know.

¶ 38 Respondent admitted that he sent the messages to petitioner through Snapchat. He initially testified that he did not recall why he sent the message with the nude photo, but then he stated that he "thought [they] could rekindle the relationship." He stated that he "was led to believe that [the

relationship] was going well." He apologized for sending the nude photo; his "intent was not to p*** [petitioner] off. [He] thought it was cute or creative at the time." He also said, "It was something that we had done previously. So it was a big part of our relationship." He again stated that he "felt bad about it being ill received," and he averred that "everything has been deleted." He never disseminated the photo to anyone else.

¶ 39    When asked how he would describe his current relationship with petitioner, respondent stated, "None." When asked how he would characterize his relationship with petitioner when he sent the Snapchat messages and during their March 2023 phone call, he replied, "Friendly."

¶ 40    The trial court granted the plenary order of protection, finding that respondent abused petitioner by harassing her and interfering with her personal liberty. After setting forth the definitions of " '[h]arassment' " and " '[i]nterference with personal liberty' " (see 750 ILCS 60/103(7), (9) (West 2022)), the court made the following findings:

> "Three, *** petitioner and *** respondent were in a dating relationship, which ended in December [*sic*][2] of [20]22. At the end of the relationship, *** petitioner blocked *** respondent from her social media accounts. ***[R]espondent was aware that he was blocked from her accounts and was aware that she did not want any contact from him.
>
> Four, in December of [20]22, *** respondent text[ed] *** petitioner, Merry Christmas. *** [P]etitioner did not recognize the number and text[ed] back, Merry Christmas.

---

[2]The trial court meant September 2022.

When *** respondent sent another message the next day, *** petitioner realized it was *** respondent who sent the message and responded back, including a statement to lose my number.

See [p]etitioner's [e]xhibit [No.] 17.

*** [R]espondent sent another text a couple of months later asking to talk to her and wanting to ask her about someone close to her.

[See] [p]etitioner's [e]xhibit [No.] 18.

Six,[3] after the phone call, *** petitioner had no contact with *** respondent for about one year until he reached out to her under an assumed identity on Snapchat.

Seven, *** petitioner assumed it was *** respondent reaching out to her. She accepted his friend request, and he asked, can we talk later. She responded, I don't—oh, he asked, can we talk later. I don't have time now.

See [p]etitioner's *** [exhibit] [No.] 19.

Eight, *** petitioner responded, if you're so hell bent on it, you don't deserve my time regardless. Respondent responded, hell bent on what[?] Petitioner responds, talking to me.

Also see [p]etitioner's [e]xhibit [No.] 19.

Ten, *** respondent immediately responds with, LMAO, I have my reasons. LMAO is slang for laughing my ass off.

Eleven, *** respondent included in that response an explicit picture of the petitioner that she had sent him during their relationship.

---

[3]There is no fifth point.

Twelve, the court had the opportunity to judge the credibility of the witnesses and finds that *** petitioner's testimony is credible.

Thirteen, the court does not find *** respondent's testimony credible. He couldn't remember why he sent the picture. He thought they still had a friendly relationship after having no contact with *** petitioner for over a year.

In addition, when it appeared that *** petitioner did not want to talk to him, he sent the picture to get her to respond to him.

Fourteen, the sending of the explicit picture was clearly meant to harass the petitioner. The sending of the explicit picture after a relationship had ended approximately 18 months earlier would cause a reasonable person emotional distress.

Fifteen, *** respondent interfered with the personal liberty of *** petitioner by committing harassment to compel her to continue to have contact with him, a right that she has to refrain from.

Sixteen, *** petitioner proved by a preponderance of the evidence that *** respondent harassed her and interfered with her liberty.

Seventeen, in the ten phone calls since September of [20]22, *** respondent insisted that if she would talk to him, then he would leave her alone.

And he continues to use that kind of language throughout his contact with her, if she would do something, then he would stop doing something else.

So I do believe *** petitioner has proved by a preponderance of the evidence that *** petitioner is both [*sic*], is an abused petitioner under the *** Act, and I'm going to order the plenary order of protection."

¶ 41    This timely appeal followed.

¶ 42                                    II. ANALYSIS

¶ 43    Respondent argues that (1) the trial court's finding that he abused petitioner was against the manifest weight of the evidence and (2) the court failed to consider the statutory factors required by section 214(c) of the Act (*id.* § 214(c)).

¶ 44    Under section 219 of the Act (*id.* § 219), a plenary order of protection "shall issue" if a petitioner has, among other things, satisfied the requirements of section 214 (*id.* § 214). In turn, section 214(a) provides that an order of protection "shall issue" "[i]f the court finds that [a] petitioner has been abused by a family or household member." *Id.* § 214(a). " 'Family or household members' include *** persons who have or have had a dating *** relationship." *Id.* § 103(6). " 'Abuse' " includes "harassment" and "interference with personal liberty." *Id.* § 103(1). " 'Harassment' means knowing conduct which is not necessary to accomplish a purpose that is reasonable under the circumstances; would cause a reasonable person emotional distress; and does cause emotional distress to the petitioner." *Id.* § 103(7). " 'Interference with personal liberty' means committing or threatening physical abuse, harassment, intimidation or willful deprivation so as to compel another to engage in conduct from which she or he has a right to abstain or to refrain from conduct in which she or he has a right to engage." *Id.* § 103(9).

¶ 45    The standard of proof in a proceeding to obtain an order of protection "is proof by a preponderance of the evidence." *Id.* § 205(a); *Graham v. Van Rengen*, 2024 IL App (2d) 230611, ¶ 53; see *Best v. Best*, 223 Ill. 2d 342, 348 (2006). "Proof by a preponderance of the evidence means that the facts at issue are rendered more likely than not." *Graham*, 2024 IL App (2d) 230611, ¶ 53. This court will reverse a trial court's finding by the preponderance of the evidence only if it is against the manifest weight of the evidence. *Best*, 223 Ill. 2d at 348-49; *Graham*, 2024 IL App (2d) 230611, ¶ 53. "A finding is against the manifest weight of the evidence only if the opposite

conclusion is clearly evident or if the finding itself is unreasonable, arbitrary, or not based on the evidence presented." *Best*, 223 Ill. 2d at 350. Under this standard of review, we give deference to the trial court because it is in the best position to observe the demeanor and conduct of the parties and the witnesses. *Id.* We will not substitute our judgment for that of the finder of fact regarding witness credibility, the weight given to the evidence, or the inferences drawn from the evidence. *Id.* at 350-51.

¶ 46    As noted, the trial court's conclusion that respondent abused petitioner was based on its finding that he harassed her and interfered with her personal liberty. More specifically, the court found that respondent harassed petitioner by sending her an explicit photo of her—18 months after their relationship had ended—which would cause a reasonable person emotional distress. The court further found that, in committing this act of harassment, respondent interfered with petitioner's liberty by compelling her to continue having contact with him, something she had a right to refrain from. In making its findings, the court specifically noted that petitioner's testimony was credible and that respondent's was not. The court's findings were not against the manifest weight of the evidence.

¶ 47    As noted, it is undisputed that the parties broke off their relationship on September 24, 2022. The video from that date confirms that respondent was aware that petitioner had blocked him from contacting her and that she expressly told him that she wanted no further contact with him. Despite this knowledge, respondent contacted petitioner in December 2022. Petitioner told respondent to "lose [her] number." Respondent again texted petitioner in February or March 2023. When petitioner did not agree to speak to respondent, he told her that he wanted to "ask [her] about someone close to [her]." Petitioner agreed to speak to respondent because she was "worried" about the person he was referring to. Petitioner ended the conversation by telling him that she "did not

want him to contact [her]." Nonetheless, respondent contacted petitioner again in February 2024. The February 2024 contact ultimately included respondent sending a naked photo of petitioner. A reasonable person would be distressed by respondent's actions, and, indeed, petitioner testified that she was. Thus, the trial court's finding that respondent's actions were harassment was not against the weight of the evidence.

¶ 48    The trial court's finding of harassment is enough to support the court's finding of abuse. See 750 ILCS 60/103(1) (West 2022). Nevertheless, the court made the additional finding that respondent's acts of harassment interfered with petitioner's personal liberty in that, by committing harassment, respondent sought to compel petitioner to continue contact with him, which she had a right to refrain from. See *id.* § 103(1), (9). The court stated: "when it appeared that *** petitioner did not want to talk to him, he sent the picture [(in February 2024)] to get her to respond." The court noted that respondent had previously "insisted that if she would talk to him, then he would leave her alone," and the court specifically noted the 10 voicemails from September 2022. The court found that respondent "continue[d] to use that kind of language through his contact with her, if she would do something, then he would stop doing something else." The court rejected as incredible respondent's testimony that "[h]e couldn't remember why he sent the picture" and that he thought he and petitioner still had a "friendly relationship after having no contact with [her] for over a year." Thus, the court's conclusion that respondent's actions interfered with petitioner's personal liberty was not against the manifest weight of the evidence.

¶ 49    The crux of respondent's argument on appeal is that the trial court, in making its finding of abuse, failed to consider petitioner's "own expressed interest in communicating with [respondent] or their relationship being in limbo, which compelled [respondent] to continue contacting her after their breakup in September 2022." According to respondent, the evidence that

the trial court "ignore[d]" includes (1) the "mixed messages" petitioner sent respondent about continuing their relationship; (2) the fact that petitioner "admitted to confusing [petitioner] about their breakup"; (3) petitioner's letter to respondent that included her expression of love for him; (4) the fact that, on the night of their breakup, petitioner had told respondent that she would kiss him; (5) petitioner's own description of the parties' relationship as being in "limbo"; (6) affirmations from petitioner that "continued to inspire" respondent to "reach out to [petitioner] to rekindle their relationship"; and (7) petitioner's "expressed interest in [respondent's] periodic return to talking to her." Respondent maintains that the above evidence rendered his conduct "reasonable to accomplish the purpose of getting the part[ies] out of their limbo relationship."

¶ 50    The problem with respondent's argument is that it is primarily based on events that transpired before the parties' breakup on September 24, 2022, and, in many respects, mischaracterizes the evidence. To be sure, petitioner acknowledged on cross-examination that she arguably sent respondent "mixed messages." She testified that, although she would tell respondent that she "wanted to be left alone," she "would agree to the relationship, [but] only because [she] felt pressured by him." She also agreed that "it seem[ed] like he was [confused]." She further agreed that she sent respondent a letter before their breakup, which, according to respondent, included petitioner's expression of love for him. However, she emphasized that the "letter, first and foremost, said that [she] wanted to be left alone." And she explained that she "can still care about someone, love them, but not want to be in a relationship with them."

¶ 51    Nevertheless, even if petitioner's actions before the parties' September 24, 2022, breakup—including respondent's claim that petitioner, before she began recording, had agreed that she would kiss him—sent mixed messages to respondent as to the status of their relationship, petitioner made her feelings clear on the video from that date. There is no question, as evidenced

by respondent's voicemails and comments during the video, that respondent was aware that petitioner had blocked him from contacting her. During the video, petitioner repeatedly told respondent that she wanted no further contact with him. She told him that she lied to him "a lot" in the previous weeks. She stated: "I have made it clear that I do not want to hear from you. That I do not want to see you." Petitioner told respondent that, if he did not stop contacting her, she would get an order of protection. Nothing is confusing about what transpired that day.

¶ 52    Respondent's other attempts to justify his actions mischaracterize the evidence. First, respondent's reliance on petitioner's reference to the relationship being in "limbo" ignores the fact that, when petitioner used the word "limbo," it was in reference to the nature of the relationship *before* the breakup. Petitioner testified that, during the time they spent together on September 24, 2022, before she began recording, "[respondent] thought [they] were on good terms still, you know, good in whatever this limbo of [their] relationship was." This "limbo" status ended with the breakup that occurred during the recording.

¶ 53    Respondent also claims that "affirmations" made by petitioner "inspired" respondent to "rekindle their relationship." According to respondent, in the video, petitioner said " 'we'll see, and I mean that genuinely[,]' in response to [respondent's] question regarding the parties['] coming back together." That is a generous interpretation. During the video, respondent referred to petitioner blocking him and asked her whether, if respondent promised to continue therapy, she would "eventually unblock him and [they] *will eventually be able to be civil*." (Emphasis added.) Petitioner responded, "We'll see, and I mean that genuinely." Petitioner's openness to being "civil" with respondent in no way implied any desire on her part to "rekindle" her relationship with him or "com[e] back together."

¶ 54    Respondent also claims that petitioner "expressed interest in [respondent's] periodic return to talking to her." According to respondent: "This is evident by the hour-and-a-half conversation in March of 2023 and the parties['] shared Snapchat messages with one another in February 2024." He further asserts that "[petitioner's] interest is also ultimately why she called [respondent] in February 2024." Again, this is a generous interpretation of the testimony. Petitioner testified that she agreed to speak with respondent in March 2023, but only because he sent a message saying that he wanted to ask her about someone "close to [her]." She explained: "I was worried for someone close to me. I thought that he was going to say that he was going to start going after someone I cared about, which he did." She testified further that she attempted to call him in February 2024 only after getting "notifications of random [Snapchat] accounts trying to add [her]." She believed that respondent was "trying to get to [her]," and she "want[ed] to know why." She did not want to talk to respondent for any other purpose.

¶ 55    Based on the foregoing, we conclude that the trial court's finding that respondent abused petitioner was not against the manifest weight of the evidence.

¶ 56    Respondent next argues that the plenary order of protection must be reversed because the trial court failed to consider the statutory factors required by section 214(c) of the Act (*id.* § 214(c)). He argues further that, had the court considered certain factors, it would not have entered the plenary order.

¶ 57    As noted, section 219 of the Act requires that a petitioner satisfy the requirements of section 214. *Id.* § 219(2). Section 214(c) of the Act provides, in relevant part:

"(c) Relevant factors; findings.

(1) In determining whether to grant a specific remedy, other than payment of support, the court shall consider relevant factors, including but not limited to the following:

(i) the nature, frequency, severity, pattern and consequences of the respondent's past abuse, neglect or exploitation of the petitioner or any family or household member, including the concealment of his or her location in order to evade service of process or notice, and the likelihood of danger of future abuse, neglect, or exploitation to petitioner or any member of petitioner's or respondent's family or household ***.

* * *

(3) Subject to the exceptions set forth in paragraph (4) of this subsection [concerning *ex parte* emergency orders], the court shall make its findings in an official record or in writing, and shall at a minimum set forth the following:

(i) That the court has considered the applicable relevant factors described in paragraphs (1) and (2) of this subsection.

(ii) Whether the conduct or actions of respondent, unless prohibited, will likely cause irreparable harm or continued abuse.

(iii) Whether it is necessary to grant the requested relief in order to protect petitioner or other alleged abused persons." *Id.* § 214(c).

Respondent argues that, here, the "record does not reflect the trial court's consideration of the relevant factors expressed in section 214[(c)] of the *** Act." Respondent is incorrect that the record does not reflect the court's consideration of the relevant factors. The written plenary order

of protection consisted of a preprinted form on which the court checked certain boxes. It contained the following section:

"Civil Cases: In granting the remedies in this *Order*, the Court has considered all relevant factors, including: the nature, severity, pattern, and consequences of Respondent's past abuse, neglect, or exploitation of Petitioner or any family/household member, including Respondent's concealment of their location in order to evade service of process or notice, and the likelihood of danger of future abuse, neglect, or exploitation to Petitioner or any member of Petitioner's or Respondent's family or household; and the danger that any minor child(ren) will be abused, neglected, removed from the jurisdiction, improperly concealed within the State, or improperly separated from the child(ren)'s primary caretaker. The court finds that:

The Court has jurisdiction over Petitioner, Respondent, minor children and other Protected Persons.

Venue is proper.

Respondent has abused Petitioner and/or the children identified as protected persons in Section 5 on page 4 and/or the

Protected Persons listed on page 1 of this *Order*.

The actions of Respondent will likely cause irreparable harm or continued abuse unless they are prohibited.

It is necessary to grant the requested relief in this *Order* to protect Petitioner or other abused persons." (Emphases in the original.)

The box next to this section contains a handwritten X.

¶ 58    In his opening brief, respondent does not acknowledge this section of the plenary order or the fact that the trial court checked the box. Respondent makes no argument that checking the box is insufficient to meet the requirements of the Act. Thus, any such argument is forfeited. See *Gakuba v. Kurtz*, 2015 IL App (2d) 140252, ¶ 19 (a party's failure to cite relevant authority forfeits his argument). Nevertheless, we find no error.

¶ 59    In *Landmann v. Landmann*, 2019 IL App (5th) 180137, ¶¶ 13-19, the Fifth District considered whether, in issuing a plenary order of protection, the trial court complied with section 214(c)(3) of the Act. As in this case, the trial court's "written order consisted of a preprinted form on which the court checked off boxes and handwrote certain orders." *Id.* ¶ 17. The reviewing court found:

> "The 'Findings' section of the order, beginning on page 11, included the following optional findings: '[t]he actions of Respondent will likely cause irreparable harm or continued abuse unless they are prohibited' and '[i]t is necessary to grant the requested relief in this Order to protect Petitioner or other abused persons.' The trial court checked the boxes next to each of these findings, thus satisfying sections 214(c)(3)(ii) and (iii)." *Id.*

However, the preprinted form did not include any language satisfying section 214(c)(3)(i) of the Act. *Id.* Thus, the court reversed the plenary order of protection because "there [was] simply no record of this finding available for our review." *Id.* ¶ 19. Here, because the trial court checked the box on the preprinted form indicating that it considered section 214(c)(3)(i), (ii), *and* (iii) of the Act, the court satisfied the Act's requirements. See *Graham*, 2024 IL App (2d) 230611, ¶ 59 (recognizing that the trial court may comply with section 214(c)(3) via a form order that contains the statutory language).

¶ 60    Respondent alternatively argues that the evidence does not support a finding that there was a pattern of abuse (because he sent only one inappropriate photo to petitioner), that the abuse was severe (because such photos were part of the parties' relationship), or that there was a likelihood of future abuse (because he "apologized to [petitioner] within the same correspondence," stating further that he thought that they could "rekindle their relationship" and were on "friendly" terms). We disagree.

¶ 61    First, as already noted, the trial court found incredible respondent's claims as to what he believed regarding the nature of the parties' relationship when he sent the explicit photo. We also note that respondent once again mischaracterizes the evidence when he argues that there was no likelihood of future abuse, because he "apologized to [petitioner] within the same correspondence." To be sure, respondent apologized—but not for sending the explicit photo. Instead, he stated: "Alcohol made me an ass to you and I apologize for that and putting you through that hell." This was clearly a reference to the parties' past relationship, not his current conduct. And, although petitioner may have initially shared the photo with respondent while they were dating, she testified that, when he sent it to her, she felt "[s]cared, very defeated," and "extremely violated." The court specifically noted that "[t]he sending of the explicit picture after a relationship had ended approximately 18 months earlier would cause a reasonable person emotional distress."

¶ 62    In any event, we hold that the pertinent section 214(c) factors were satisfied given respondent's repeated contact with petitioner—despite her efforts to block him and her many requests to be left alone—culminating in the sending of an explicit photo that was an attempt to compel her to contact him and that made her feel "[s]cared, very defeated," and "extremely violated." We affirm the entry of the plenary order of protection.

¶ 63                                III. CONCLUSION

¶ 64    For the reasons stated, we affirm the judgment of the circuit court of Kendall County granting petitioner a plenary order of protection against respondent.

¶ 65    Affirmed.

---

### *Montelauro v. Lutkus*, 2025 IL App (2d) 240369

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Kendall County, No. 24-OP-82; the Hon. Jody Patton Gleason, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | Richard Ian Conner, of Kollias, P.C., of Winfield, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Therese Edmiston, of Prairie State Legal Services, Inc., of West Chicago, for appellee. |

---